May it please the Court. My name is Sheila Haddock and I represent the appellant in this case, Jane Roe. At the time the events underlying this case arose, Jane was a 14-year-old student, a freshman in one of the high schools in the defendant, Cyfair ISD. During my time before the Court, I'll explain how, by applying the wrong summary judgment standard, the District Court erred in granting summary judgment and dismissing her claims under Title IX. It's important to note at the outset that in the District Court, Ms. Roe brought Title IX claims under two theories of recovery under Title IX, the first being a pre-assault, official policy-based heightened risk claim, and the second, the more traditional deliberate indifference claim. On appeal, she's narrowed that to only the deliberate indifference claim. There's been some confusion, I think, in the briefing because we did brief the known circumstances that the District has implied that we are just repackaging the heightened risk claim. You don't need heightened risk to, I mean, we haven't established whether we have that in the circuit yet, and your position is you don't need that to overcome summary judgment. Is that your position? Exactly, Your Honor. We recognize that while heightened risk as a theory is evolving in other circuits, in the District Courts, in this circuit, we realize it hasn't reached this Court yet, and we don't believe, frankly, that this is the right case for the Court to address that, and you need not do that now. So the sole issue before the Court today is whether summary judgment, whether based on this summary judgment record, a reasonable jury could conclude that the School District acted with deliberate indifference to Ms. Rowe's claim of sexual assault. That is- We're dealing with the pre-assault also, though, right? Their indifference pre-assault and their indifference post.  Yes, Your Honor. Pre-assault because when she said, the mother said, she's being abused on multiple occasions, the school said, oh, well, we can't put them in different classes, and we can't do any of, I mean, we can't do any of the things that you want to keep them away because we don't do that, right? And then the post is all the things that alleged bullying and that sort of thing, and how he also approached her. Is that correct? Yes. And they didn't accommodate her education also. Is that right? Yes. I just want to make sure I have all the claims. Yes, that's right. You've described it accurately that it becomes part of the known circumstances because the question is, was the district clearly unreasonable under the known circumstances? And we can't create an artificial barrier and look at just the incident or the assault and then everything that came after without keeping in mind the context. And that includes, I had not planned to argue it here today, but that includes the information that we provided regarding the Texas statute and dating violence, recognizing that since 2007, Texas was the first state to actually enact a law requiring school districts to address dating violence. So our argument is that since 2007, school districts, including Cy Fair, which is the third largest school district in the state of Texas with all the resources that come along with being a very large resource, they were aware since 2007 that dating violence was a problem. So I think Judge Elrod helpfully pointed out there is a pre-assault deliberate indifference claim. There is a post-assault deliberate indifference claim. I distinguish those in my mind. With respect to the pre-assault, we are talking about deliberate indifference, and although the facts here are very bad, isn't it true that to show deliberate indifference, you have to show actual knowledge of what? How would you say it? Actual knowledge of what? I can direct the court to Doe v. Fairfax County School Board. It's a June 2021 opinion that's cited in our reply brief, and it's an example of where it addresses the known actual knowledge and known circumstances and how those overlap. Well, still, I appreciate that, and I can read that case, but what do they have to know about? They have to have actual knowledge, the people who are in a position to do something about the problem. They have to have actual knowledge. It's, for example, is it enough to know children are having sex in stairwells? That's absurd. I can't believe I just said that sentence, but I did. Is it enough that they know that that's happening, or do they need more knowledge of this particular problem, this particular student, this particular couple, in order to show deliberate indifference because that's quite a high standard? The pre-assault deliberate indifference analysis is a little bit more difficult. I don't know that I can give you a specific definition of what they need to know. Well, I mean, but we have to, in order to decide the case, we have to know that. Is it enough to know that there are problems generally with student sexual activity? What do they need to know? No, Your Honor. It's not enough to know generally because, as you said, that can be said of every school district in every state across the country, unfortunately, and it has, for decades, been something that school districts know about. But in this case, let's focus on what CyFair knew. They knew that it was a problem. They knew that they were ... What's it? Well, they knew that dating violence was an issue. They knew that sexual assault on campuses was an issue generally. Specifically, they knew that they were required to provide education and training to students and staff. The record shows they did not do that. They knew that they used a disciplinary system. There was a structure set up by which, if you look at Carol Gibson's deposition testimony, is particularly illuminating, really, for every issue in this case. If you look at her deposition testimony, it directly conflicts with what the district's answers to Ms. Rose's inrogatories and requests for production for simple data ... I'm sorry. You knew water? I'm sorry. So I guess ... So I hear what you're saying. What's your best case for the actual knowledge, that level of generality, whatever that is, that sounds more specific than, well, we know that there's a problem, generally, but what's your best case that shows that kind of knowledge, that actual knowledge of sort of ... We're not following Title IX policies, that that can create a fact issue on deliberate indifference. That would be Doe versus Fairfax County School Board, which is the Fifth Circuit case decided this summer. Now, specifically with regard to these children, Gibson knew from the mother that, allegedly, Doe had been abusive before the incident, was emotionally and possibly physically abusive, right? Yes. Yes. What was done to protect her from Doe at the ... I mean, from Doe at the school once they realized that ... It seems like they said, no, we can't protect. They did. Is there a fact issue on that? Did they say they did try to protect? I guess if there's a fact issue, that's still good for you today. Aside from just the more general issues, you're right. Looking at the pre-assault facts for Roe, Carol Gibson acknowledges that she met with Jane's mother and Jane's grandmother in the fall of 2013, in which they shared concerns about her relationship with this boy, that she was emotionally and possibly physically abused. The mother really didn't know what was going on right now, but they knew that her grades were starting to slip and it was a problem. They asked Ms. Gibson what they could do. Could they keep them apart? Did the school know that she had been receiving treatment? Was the school aware that she had received treatment, psychiatric treatment? Are you ... If you're referring to the incident that happened over Christmas break, winter break between ... Where she cut herself about her ... Because her mom forbade her from ... That's all related to the ... I mean, I'm sure the trauma expert would say that's all related to the emotional abusive situation, if there indeed was one, which I'm sure that there's facts on that. Did the school know that, or did they not know? The record shows that Jane's mother spoke with her volleyball coach and told him that, or the ... Softball coach, a coach. Randy Knight, Kite, or something. And told him that she would be missing practice. Because of the treatments that she was having. Because of the cutting. But not that she'd gotten psychiatric treatment as a result of this. No, Your Honor. I don't think there's anything in the record to indicate that anyone at the school knew she had been ... And then they met again with the administrators. Did that include Gibson on March 2014? March 4th, 2014, there was a meeting between Carol Gibson, who was the AP that Jane was assigned to, along with Rashad Godbolt, who was the AP that was assigned to the young man. The volleyball coach, Jane was a volleyball player. And several other people that have not been identified, either by the district or Jane, can not remember who else may have been in attendance. But we know that Carol Gibson and Rashad Godbolt, the two assistant principals, were present. And Rashad Godbolt testified in his deposition that he recalls the meeting and recalls that he was there because he was the boy's AP. But it doesn't even matter whether they even recall it or not, because you're just trying to create a fact issue, right? Yes, Your Honor. And you have the mother's side of the story. Yes. Here's what I'm concerned about. I'll be very frank with you. Evidence that these kids were in a relationship that's way too intense, that they should spend time apart from each other, that there's some psychological problems with, is that – I mean, I imagine – talk about what's going on in schools – I imagine that happens all the time. These kids should not be seeing each other, right? Is evidence of that nature enough to put a school on notice that they're going to be deliberately indifferent when a sexual assault then happens out of that relationship? Or do we need more? We need more than that. Okay, what more do we need? We need – it all comes together with the facts. They knew that the stairwells were a place that kids went to do bad things. And I think – I'm struggling with this because my focus is really on the post-assault deliberate indifference. I do have some questions about that. And recognizing that pre-assault deliberate indifference is more difficult because it involves a variety of facts and the necessity to crystallize everything. But even going back as far as Davis versus Monroe County School Board, we know that it's a constellation of surrounding circumstances. So we can't ignore all of the surrounding circumstances. So I'm struggling to provide you a list of saying because they knew this and they knew this and they knew this. I can imagine a case, though, that's much easier for you where the mother comes and says I think he might have – they might have had sex and it was not consensual, right? Yes. That would be – that would be easy, right? And if they said, well, it's too bad, we can't do anything about that, right? That would be easy. What we know is that she told them that she had concerns about the relationship, that it was impacting her education. She was – she had forbidden them to see each other. She had taken her phone away. She had taken her computer away. She had done everything a mother could possibly do at home. And she went and on at least two occasions in December and then again in the March meeting pleaded with the school administrators to do something, to change their schedule. What should they have done? She asked them to change their schedule so that they would not have class together anymore. She asked – they could have done. She didn't ask for this, but they could have at that point imposed a no-contact order. They didn't do that. They didn't even suggest it. Instead, they responded, we can't really do anything about that. And at most – Turn to the other argument now, the post, because I think Judge Duncan asked you a situation. What if the mother comes and says, I think they had sex and it was non-consensual? That's exactly where we are, allegedly, if – at the post period. Yeah, post-assault. So tell me, I guess, just make your argument about what specifically did they do, did they fail to do, that showed deliberate indifference post-assault when there's an investigation going on? I think it's hard to talk about what they did or shouldn't have done without looking at the record and examining all of the conflicts and contradictions, because what happened here is the district court took one version of the facts that the district advanced in their brief, which was actually a blended version of facts that they cherry-picked from the various witnesses and the answers to discovery. Then the court drew inferences in favor of the school district to support that, and then at the same time ignoring Jane's evidence. That certainly sounds problematic on summary judgment, because you shouldn't do that on summary judgment. So let's just – let's assume for purpose of argument that that's incorrect. But tell me, what are the fact issues that do create – that create a material fact issue as to the CFISD's deliberate indifference post-assault? We have to start with the investigation, the report. The report came to CFISD police on the night that it happened in the police. So if we look at the – the best framework I can give to look at it is if we take the school district's brief, and on page 29 to 31, they argue what – why they believe that what they did was not clearly unreasonable. And if we look at that, they start with the police report, and they say that it was undisputed that the police responded to the hospital. Yes, that's undisputed. They did. But they make a note and say, notably, Roe did not tell officers she had been assaulted. So they rest their – the reasonableness – Okay. So you're saying – I don't mean to – I know you're out of time, but I do want to – I think one of your complaints is they should have talked to her directly. They shouldn't have relied on the investigation. Is that right? They didn't even rely on the investigation. That's at the heart of this. Carol Gibson – But I thought you just said that the police – they were waiting for the investigation to see if it was consensual or not. No. Okay. So is part of the deliberate indifference that you claim here is that they – Gibson did not interview her specifically? That's part of it. Okay. So what's your best – So what if the evidence shows – does the evidence show that the police investigate – that the police talked to her, CFISD police? There's a disputed issue of fact on that. You're saying it's disputed whether the police even talked to her? The police say that they talked to her in the hospital. Okay. What's the – Is that the HCSO or the CH?  The C – the campus police say they talked to her while she's under investigation. While she's under sedation. Yes. The campus police – Or not – whatever. Yes. You're saying that's disputed. So what's the evidence that disputes that they even talked to her? She does not recall speaking to them. And their point is that she can't dispute what the officer said that she – said that it was consensual. Did anyone in the district look at this from a trauma-informed perspective of interviewing an alleged complainant or victim? Trauma-informed – No, Your Honor. Perspective. That existed back at this time period, didn't it? Yes, Your Honor. And was it a requirement in the school district to use that approach? I don't know that it was a requirement. It was certainly best practices, and it was something that they were trained on. And no, Your Honor, no one – no one from the school district except for Chantel Mitchell, the officer who responded, ever talked to Jane Rowe about this incident at all. She talked to her that night or that early morning hours of March 11th. But when she got back to school, did they talk to her about, these are the accommodations I'm going to need going forward, regardless of whether it was consensual or rape, it was a traumatic event, and I'm going to need some accommodation. And did they accommodate her? No. We know from the record that the mother asked that they ensure that they not have any classes together or do whatever they could to have no contact. They didn't do that. I'm going to have to call a time because we've let you far exceed your time. Thank you. Can we maybe start there? Sure. You're Ms. Hamm, right? Okay. He asked your name. Yes. May it please the Court. Stephanie Hamm on behalf of Cypress-Fairbanks Independent School District. Did the Title IX officer – is that Ms. Gibson in this story? The Title IX coordinator at the time in question was Deborah Stewart. Did the Title IX coordinator or her designee interview the victim in this – the complainant in this Title IX case? No, she did not. Isn't that highly unusual? Ever interview her, not at the hospital, but just ever in the whole – in order to make her own decision of whether or not a Title IX incident occurred. Isn't that highly unusual? Well, it's not highly unusual in the sense that that sort of thing happens all the time where there is a person on the campus who is charged with conducting an investigation, whether it's a Title IX investigation, student conduct investigation. Those investigations are generally held at the campus level, and there are certainly multiple cases in which that administrator did not then pass along the issue to a Title IX coordinator. Did anyone interview the alleged – the complainant in this case? Yes. At the school, not the police at the hospital, which – assuming that occurred, did anyone – when the person is after the incident and not in the hospital having surgery from whether it was consensual or not, did anyone ever interview Ms. Rowe? No, they did not, because she did not actually return to school the rest of that entire school year. The district provided her with homebound services, which is an accommodation that they did provide, even though Carol Gibson had determined by that point that what happened in the stairwell was not a sexual assault. How did she determine that if she did not complete the investigation? You said they didn't complete the investigation because she didn't come back. I thought you just said that. No, I did not intend to say that she did not complete her investigation. She did conduct an investigation with some assistance from Rashad Godbold. How can you have an investigation without interviewing the complainant? I work in a lot of Title IX circumstances, and I've never heard of not interviewing the complainant. And it doesn't have to be – you're right – it doesn't have to be the coordinator, because sometimes those functions are designated. It's undisputed that Carol Gibson met with Rowe's mother twice. Rowe's grandmother said she also met with Gibson, so there's no dispute that Gibson received their side of the story. And when I say their side of the story, I really do mean Rowe's mother's side of the story because her story and Rowe's story have never actually entirely matched up. How did she hear Rowe's story? It's unclear, but what we do know – Is it clear that she ever received – is it undisputed whether or not she ever received her story? I don't think there's a dispute because for all of the complaints about Gibson's investigation and how she arrived at her determination that both parties claimed that this incident both began and ended as consensual, she wasn't wrong. She was not wrong. Rowe's story in the hospital was that this was consensual. It's reflected in the school district's police report. It's reflected in the medical records. Right, but it's not uncommon for a victim of trauma to say, especially if they're in an abusive relationship, that something's consensual. So her description of – her characterization of it is not nearly as valuable as her recounting of the facts of what occurred. That's what a trauma-informed investigation would be taking more into account, isn't it? Certainly it is not unusual for a victim of sexual assault to lie to protect the perpetrator, and that may very well be what happened here. But the fact is that her story, Rowe's story, up until the time she left the hospital the second time, was that this was a consensual sexual encounter. Let me just anticipate Judge Elrod's next question, which is you're talking about Rowe's story, but where did they get the story from if there was nobody who talked to her? Gibson says she does believe she spoke to Rowe. There's no evidence of that separate and apart from it, but we do know that she understood Rowe's side of the story because, again, she was not wrong. She was not operating under some erroneous set of facts. She was not wrong. We don't know whether she was wrong because she didn't have that notion of wrong. She was not wrong in the sense that at that time Rowe's story was that it was consensual. Her story was that she allowed her boyfriend to insert his entire hand. I don't want to get into the details, but that was her story. She said it was not an assault, that she agreed to the act. And so even if she was lying at that point. The sort of horrific facts that you just said, she knew that? The nature of the intrusion into her, the nature of the violation of her body, whether it was consensual or not, did she know that? Gibson knew from Rowe's mother that there was an allegation that Doe had used his entire hand and that Rowe was horribly injured as a result. It's not just an allegation. That's supported by the medical evidence, the extensive medical evidence in the cases, isn't it? There is absolutely evidence that Rowe was horribly injured. There is no dispute about that. She was horribly injured, yes. Absolutely, there is no dispute. But Title IX liability does not turn on whether someone was injured because an injury does not necessarily negate consent, nor does it necessarily evidence an intent to harm. It is not unreasonable if your understanding is that both sides are saying this was consensual, both at the beginning and the end, and your understanding is that there's no other witnesses. The only video shows them walking arm in arm, happy as can be, 10 to 15 minutes before the alleged assault. It is not clearly unreasonable under those circumstances to conclude that Rowe was injured horribly. Without even interviewing the victim. Was the alleged victim, the complainant, was Doe interviewed by Gibson? Yes, he was. I thought there's a fact issue on that. It is undisputed. Both Gibson and Godbolt testified that they spoke to Doe, got his side of the story, and it's undisputed that Gibson told Doe to stay away from Rowe. Those facts are undisputed. There are no facts. At the time before she made her determination, before Gibson made her determination that this was not a Title IX incident or whatever the determination was, the fact that it's consensual doesn't mean it's not a Title IX incident, by the way, under these circumstances. So I can't tell. It seemed like she determined it was consensual and then that was no longer a Title IX incident. That's not correct either, is it? Well, even if the decision is incorrect, that is not evidence of deliberate indifference. Under this Court's ruling in Doe v. Dallas ISD, reaching an erroneous conclusion is not in itself. Okay. So had she talked to him by that time? She had, yes. Okay. Undisputed record evidence that she talked to Doe before she made a decision? Absolutely. They spoke to him the day after the alleged assault, which is the same day that Carol Gibson learned of it. They spoke to Doe. They instructed him to have no further contact with Roe. They contacted Doe's mother to make sure she was aware. Doe or Roe? I'm sorry? Doe or Roe's? Doe's mother to make sure that she was aware. And there's simply no evidence that the district was deliberately indifferent based on what they knew. So I'm hearing some facts. Let me give you a chance to just complete the sentence. CFISD was not deliberately indifferent in their response to the alleged assault because? Because it is undisputed that the district's police officers reported to the hospital within 15 minutes of the report because it is undisputed that they spoke to Roe in the hospital. It is undisputed that they obtained a written statement from Roe's mother. They spoke to the nurses to find out information about the nature and extent of Roe's injuries. They went to the high school the next day to pull video surveillance to see what else they could find. And then because they were a relatively new department, not equipped to handle this sort of investigation, they handed it off to the Harris County Sheriff's Office. And we know they did a very thorough investigation. They did everything that Roe claims the administrator should have done, but they reached the same conclusion, which was that Roe was injured during a consensual sexual encounter. That's the same decision Carol Gibson reached, and Gibson did perform an investigation. There are a lot of complaints about that investigation, but it is undisputed that she spoke to Roe's mother twice. She spoke to Roe's grandmother. It is undisputed that they spoke to Doe. It is undisputed that they looked at video surveillance. And it's undisputed that Gibson did talk to the district's police department. Now Roe claims she waited too long because she had already reached her conclusion at that point, but the fact remains that she did discuss her conclusion with them, and she testified that had the police determined that this was a sexual assault, she could have changed her mind. And we know— Why is that a—I don't understand that at all, because the police have a different standard than what—you know, one is a preponderance and one is beyond a reasonable doubt. And so if they determine that we cannot prove, and it seems to be there's some evidence that's consensual, that does not mean that you don't have a Title IX occurrence. Well, respectfully, this court held in I.L. v. Houston I.S.D. that when there is an issue, a question about consent, and when there is the potential for criminal charges, it is not clearly unreasonable as a matter of law to rely on the police. But the police's standard of review is—you know, if you're in this courtroom, that when we're reviewing something by plain error or preponderance, it's a very—I mean, or reasonable doubt, the standard of review can make all the difference in the world. I agree. I agree that they are different standards, but the fact remains that the deliberate and different standard relies on all of the facts of the case. The entire context is important. And just like in I.L., this case is very similar, because for all of the complaints about what the district didn't do or what it didn't do correctly, Roe ignores the undisputed evidence about what they did do. Again, it's very similar to I.L. In that case, you had a female student who accused a boy of sexual assault. It wasn't a boy she was dating, but it was—they had a social relationship, and she testified that she was interested in this boy. She comes forward. She provides a written statement. But administrators talk to her. They call the boy down, talk to him. They look at some text messages. They look at some video surveillance. But then the police come in, and they shut everything down. And they did that before the administrators could even reach a conclusion as to whether or not the sexual conduct was consensual. But they nevertheless told the boy to stay away from the girl, and the evidence showed that that instruction was highly successful in terms of there weren't subsequent issues. And, yes, they did— That wasn't so successful here, though, was it? It absolutely was. There were issues subsequently before August 15th whenever Roe is calling Doe names, and Doe is responding. He's not obeying a stay-away order at that point. Well, Roe admitted that there was only one post-assault incident with Doe at school, and that was the incident that was actually instigated by Roe and her family. Roe's mother—and I forget if it was her boyfriend or fiancé—had seen Doe at his place of work. They cursed at him. They called him a rapist. And then Roe sees Doe the next day at school. It's the next day. It's not during the family incident. It is the next day, but then Roe sees him— He approaches her and calls her a word. Opposite.  Yes, she— And then he says a threatening thing to her. Something about a tool, which I learned, apparently— Which is a threat. Which is a reference to a gun. I did not know that before, but I learned that in this case. We learn all these kinds of things. That's the only post-assault incident between Roe and Doe. So after he threatened her at that occasion, what did the school district do then? Roe went to Godbolt. Godbolt discussed— And he spoke to him. What kind of punishment, or did they do a do-not— There was no order ever entered what punishment was done. There's no order entered, but it's undisputed. Even Roe says she spoke to Godbolt. Then she waited outside. She watched Godbolt call Doe in. They had a very lengthy conversation in their office. You're talking about having a conversation about someone threatening someone, saying that I have a tool for you, which is— It's a gun threat. We take it that casually? We just talk about it briefly? It's not that they're taking it casually, but it is in the context of them both having this interaction where she's instigating it, he's responding. And again, Title IX, it has to be severe, pervasive sexual harassment. There's no evidence that this one incident— Severe or pervasive, not and. Well, I think the case law says it has to be severe, pervasive, and objectively offensive to rise to the level of sexual harassment under Title IX. Are you saying it's not or? I believe it's and. I know it's or in the Title VII context, but the case law says severe, pervasive, and objectively offensive. Okay. But there's no evidence that it's based on sex. If you don't think that was enough, then what did they do after she was harassed at school by the girls about this incident? Rose said she never told anyone at the school. These other incidents— And they didn't know? This is all over Instagram. Well, the Instagram was an over-the-summer issue where they were really harassing her and telling her all these terrible things. These classmates. So the school is not involved in this— It's over the summer, and there's no— A lot of schools are very much into social media monitoring. Are you saying that school district does not do social media monitoring on these kind of high— This was 2014. Ann Bothrow and her mother admit they never told the school about it. And so, no, they are not monitoring. There's 117,000 students in SciFair ISD. They do not monitor. But it was pretty pervasive. It was terrible what they did over the summer on that social media, but they didn't tell anyone at the school, so there is no— No one at the school knew. No one at the school knew. There is no dispute about that, and you cannot be deliberately indifferent without actual knowledge, which does bring me back— I do want to address an issue that was brought up in terms of the pre-assault and what knowledge is sufficient. Roe claims she's dropped her heightened risk claim, and I don't know if that's entirely accurate because she still makes all of the same heightened risk arguments. She's just relabeled them on appeal by sort of lumping them together with her deliberate indifference analysis, and this is problematic because she is effectively trying to bypass the actual knowledge requirement as to any number of vague or non-particularized issues of other alleged sexual misconduct. I mean, she argues that— I'm sorry, my mouth is very dry. She argues in her brief that it is a known circumstance, a circumstance against which the district's response must be judged, that teen sexual harassment and dating violence is a problem all across the United States, and everyone knows it—lawmakers, school officials, everyone. Well, if that sort of generalized knowledge is relevant to Title IX liability, and if it can be imputed to school officials, as Roe suggests, then does Title IX require school districts to either break up or police every single dating relationship to ensure that nothing bad happens? And if they're not successful, are they automatically liable because they know it's an issue and it's still happening? Is it per se unreasonable that these things would continue despite all this knowledge we have? Is it your position that the school district complied with the state of Texas' 2007 dating violence policy? Not making a— Talking about what they knew and what they did. Did they comply with the 2007 state of Texas policy, which is they're required to comply with? I don't think there's evidence to support that contention, but I do know that— Not that there was such a policy? You're saying there wasn't a policy? No, that we complied. There is no evidence to suggest that the district complied with those guidelines, but it is very— Did they comply or didn't comply? Did not. There's no evidence that they did comply, so alternatively they did not comply. If they had complied—I'm not familiar with the guidelines. If they had complied, what would they have done differently from what they did do? I don't know that they would— At the end of the day, was Gibson's investigation perfect? No. Was it perfect? No. But Title IX does not require flawless investigations or perfect solutions, and deliberate indifference is not a negligence standard. There is no liability based on negligence, and I see that I'm out of time. Thank you, Ms. Sam. You are out of time. I think we have your argument. Thank you very much. Ms. Haddock, we heard a litany of things post-assault that the school district represents that they did and that they are undisputed, and you heard that. Can you tell me if, in that list of things that they did, are there fact disputes as to whether any of those things occurred? Yes, there are, beginning with the law enforcement investigation. I think there is an inference being drawn by both the district court and it's being perpetuated by the school district here that Ms. Gibson relied on the school district police department investigation and then, in turn, the Harris County Sheriff's Office investigation. And it's on that basis that they rely on IL and encourage this court to follow IL, that it's very similar, when, in fact, it's not. The evidence is undisputed, actually, that she did not rely on the police investigation at all. Carol Gibson testified that she did not speak to the Cyfire police officers until after she had concluded that it was a consensual act that had gone too far. And several weeks later, she walked down to the police officer's office just to let them know. Okay, so that's possible dispute if the evidence, if the record bears that out, about reliance on police investigation. Okay, what else? She also did not rely on the Harris County Sheriff's Office investigation. Okay, so reliance on, I just want to make sure you don't run out of time, reliance on, Harris County reliance on CFISD. What else? In fact, no one at the school district was even aware of the Harris County Sheriff's Office investigation or the records or their conclusions until Brough subpoenaed the records during this litigation and produced them in discovery. And if the court reviews the transcript of Harris County's interview with her, actually supports a finding that it was not consensual or suggestion Doe talks about the fact that she tried to say no, but she was so shocked that it hurt so much. So that's all set out in our brief with quotes at length from the Harris County Sheriff's Office records. It's also a dispute over the video. CIFARE says that part of their investigation that made it reasonable was that they reviewed video at the time. There are disputes across the board as to what video was seen. Ms. Gibson says that she relied on three things to reach her conclusion that it was consensual. Her interview with Doe in which he said he used three fingers and that it was consensual. Her interview with, her interview and the written statement that she claims that she took from Jane, which Jane disputes, she never gave a written statement to anyone and she never spoke with anyone other than the officer at the hospital that night. And three, the video. Ms. Gibson says she relied on video. She testified in her deposition that there was video of the couple walking into the stairwell and walking out of the stairwell, arm in arm, perfectly fine. She said she reviewed that video with Rashad Godbold. Mr. Godbold testified in his deposition that the only video that they were able to find was at 2.30, a full 30 minutes before the incident happened, and they were not, it was at dismissal time, they were walking through the hallway among other students. Godbold and Gibson testified about watching two different videos. The police officers watched a video that is more consistent with what Godbold says that they reviewed at 2.30. There's disputes about reliance on the video. There's disputes about reliance on the police officer investigation. Okay. I don't want to induce you to go over your time. It's essentially everything about the investigation except for the parties who participated, Gibson and Godbold. Everything else is disputed. Okay. Thank you. And just briefly responding to some of the argument regarding what else is in the record, the district has maintained that the medical records also support that it was consensual because that's what she reported on that night, but replete in the other parts of the records. It refers to it as a child sexual assault, as a domestic violence incident, several other phrases. And Ms. Gibson also never talked to the police. The police say they never talked to her. I think in conclusion, the real bottom line here is this is not like every other deliberate indifference case where you have a student or a parent who is disgruntled and disappointed in the outcome, that they disagreed, they wanted the offender punished more harshly. This is not that case. There is not a single bit of evidence in the record that this has ever been about the boy being disciplined. From the very beginning, Ms. Jane's mother and Jane's concerns have been her safety at school and her education, and that's what it's been throughout. There's never been an out. There's no fact that they disputed him not being disciplined. They just wanted her to be safe and be able to have access to the educational opportunities to which she was entitled. So for those reasons, we ask that the court reverse the review. Thank you.